| | | |
|---|---|---|
| BARBARA JOHN, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BRIDGEPORT BOARD OF EDUCATION, | : | CIV. ACTION NO. |
| ALEJANDRO ORTIZ AND | : | 09-cv-378 (VLB) |
| CAROL PANNOZZO, | : | |
| Defendants. | : | March 22, 2011 |

*MEMORANDUM OF DECISION GRANTING*
*DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. #21]*

The plaintiff, Barbara John (hereinafter "John"), brought this action for compensatory and punitive damages against her former employer, the Bridgeport Board of Education, as well as Carol Pannozzo, Director of Human Resources for the Bridgeport Board of Education, and Alejandro Ortiz, Principal of Central High School and John's immediate supervisor (hereinafter collectively referred to as the "Defendants"). John alleges that the Defendants discriminated against her based upon her race, gender and age, created a hostile work environment, and retaliated against her for opposing what she reasonably believed to be employment discrimination. She asserts claims for violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e et seq. (Count One); the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(3)(4) (Count Two); 42 U.S.C. § 1983 and 42 U.S.C. § 1981 (Count Three); and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634 (Count Four).[1]

---

[1] Counts One and Two are asserted against the Bridgeport Board of Education only. Compl. ¶¶ 1-2. Count Three is asserted against the individual Defendants only. *Id.* ¶ 3. The Plaintiff does not indicate which defendants she asserts Count Four against,

Presently pending before the Court is the Defendants' motion for summary judgment as to all counts pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Doc. #21]. For the reasons that follow, the Defendants' motion is GRANTED.

## *I. FACTUAL AND PROCEDURAL BACKGROUND*

The following facts relevant to the Defendants' motion for summary judgment, which are taken from the parties' Local Rule 56 Statements and supporting affidavits and exhibits, are undisputed unless otherwise noted.

John is an African American woman who, at all relevant times, was over sixty years of age. Defendants' Local Rule 56(a)(1) Statement of Undisputed Facts [Doc. #23] (hereinafter "Def. 56(a)(1) Statement") ¶ 1. John is employed by the Bridgeport Board of Education as a physical education teacher at Central High School. *Id.* ¶ 2. She has been a physical education teacher for the Bridgeport Board of Education for thirty-six years, and has coached sports for 31 years. Compl. ¶¶ 8, 34. Defendant Carole Pannozzo (hereinafter "Pannozzo"), was employed as the Director of Human Resources for the Bridgeport Board of Education. Def. 56(a)(1) Statement ¶ 3. Defendant Alejandro Ortiz (hereinafter "Ortiz") was employed by the Bridgeport Board of Education as the Principal at Central High School, and was John's immediate supervisor. *Id.* ¶ 4.

In or around June of 2005, Alan Wallack, a white male, retired as the Director of Physical Education and Athletics for the Bridgeport Board of Education (hereinafter the "Director"). *Id.* ¶ 7. Wallack nevertheless continued to occupy the

_____

*id.* ¶ 4, and therefore it will be presumed that she asserts Count Four against all of the Defendants.

position of Director as a retiree under provisions established by the State of Connecticut Teacher's Retirement Board permitting a retired member to be employed temporarily as a teacher or administrator in the public schools of Connecticut and earn up to forty-five (45%) percent of the maximum salary level, established by the school district, for the position occupied. *Id.* ¶ 6. This earning limitation is on a school year basis (July 1 to June 30). *Id.* John claims that Wallack's appointment violated the Retirement Board's provisions because he served in the position for more than one year, and that this violation impeded her opportunity for advancement into the position of Director. Plaintiff's Amended Local Rule 56(a)(2) Statement of Disputed Facts [Doc. #32] (hereinafter "Pl. Am. 56(a)(2) Statement") ¶¶ 8-9. However, the Retirement Board's policy places no limit on the length of time that a retired teacher may continue to work in a given position, but simply indicates that appointment of a retired teacher to a position shall be in yearly increments rather than a longer contract. Def. Exh. 2, Attachment D.

On or about January 31, 2006, and on or about June of 2006, the position of Director was posted as an available job with the Bridgeport Board of Education. Def. 56(a)(1) Statement ¶ 10. John applied for both posted positions, but received no response from the Bridgeport Board of Education at the time. *Id.* ¶ 11. John claims that she was next in line to be promoted based upon her seniority over everyone else in the Physical Education Department (hereinafter the "Department") because of her thirty-one years of experience in coaching athletics, her educational background and certifications, and her positive evaluations as a physical education teacher. Pl. Am. 56(a)(2) Statement ¶ 13.

In or around February of 2007, the position of Director was again posted as an available job with the Bridgeport Board of Education.  Def. 56(a)(1) Statement ¶ 14. John re-applied for the position and was granted an interview, which took place on or about April 10, 2007.  *Id.* ¶ 15.  The interview was conducted by a panel of interviewers, all of whom worked for the Bridgeport Board of Education, including: Denise Graham, Principal of Wilber Cross School (a black female); Cynthia Fernandes, Director of Instruction (a black female); Ronald Remy, Principal of Bassick High School (a white male); Kim Bohannon, a physical education teacher (a white female); and Peter Shanazu, Athletic Director at Bassick High School (race and/or ethnicity unknown).  *Id.* ¶ 16; Compl. ¶ 26.  Defendants Ortiz and Pannozzo were not on the interview panel.

Applicants for positions such as Director are scored by the interviewers on a scale of one to five, with one being the lowest score and five being the highest score.  Def. 56(a)(1) Statement ¶ 17.  The interviewers base their scores on criteria including the candidate's personnel file, letters of recommendation, writing prompt, and work history.  Pl. Am. 56(a)(2) Statement ¶ 28.  A candidate for a position such as Director must receive a composite score of 3.0 or higher in the interview process in order to qualify for a recommendation for an interview with the Superintendent of schools.   Def. 56(a)(1) Statement ¶ 18.

There were seven applicants, including John, who were interviewed for the position of Director in April of 2007.  *Id.* ¶ 19.  John was the only female interviewed. *Id.* ¶ 30.  The remaining interviewees were white males.  Out of the previously described scale of one through five, John was given a score of "two" from one of the interviewers, and was given a "one" from the other four interviewers.  *Id.* ¶ 20.

None of the other candidates received any ratings higher than a "two" from any interviewer.  *Id.* ¶ 21.  John received one of only three "two" ratings given by any interviewer to any candidate.  *Id.* ¶ 22.  All of the remaining ratings given by all interviewers to all candidates were a "one."  *Id.* ¶ 23.

The Defendants claim that in accordance with Bridgeport Board of Education policy, none of the seven candidates interviewed in April 2007 for the position of Director achieved a sufficient score to continue in the hiring process to interview with the Superintendent of Schools, and therefore none of them were hired for the position.  *Id.* ¶¶ 24, 31.  John asserts, however, that the interview process was flawed in terms of scoring and evaluating which candidate should be hired.  Pl. Am. 56(a)(2) Statement ¶ 24.  John wrote a letter to this effect to Pannozzo on May 9, 2007.  *Id.*  The letter did not allege any discrimination in the hiring process, but instead complained about the logistics of the process.  Def. 56(a)(1) Statement ¶¶ 32-33.  John received notification that she was not hired for the position of Director on or about May 12, 2007.  *Id.* ¶ 26.  On June 14, 2007, John filed a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").  Pl. Am. 56(a)(2) Statement, Disputed Issues of Material Fact ¶ 10.  She has not submitted the CHRO complaint itself as an exhibit, nor does she summarize the contents of the complaint.  John claims that the position of Director was again posted as an available job in September 2007.  *Id.* ¶ 11.  She reapplied, but was not hired.  *Id.*

John contends that the interviewers discriminated against her by denying her ratings which would have qualified her to interview with the Superintendent for the Director position.  In support of this contention, John cites her own deposition

testimony in which she questioned whether the interview complied with Bridgeport Board of Education official policy, as well as the fact that no black person was hired for the position.  Pl. Am. 56(a)(2) Statement ¶ 25. John further contends that Michael Connor, the individual who was ultimately appointed as Director, is a white male.  *Id.* ¶ 30.  She reasserts that she was the most qualified person for the position.  *Id.*  The Defendants deny that any of the five interviewers that interviewed John for the position acted with any discriminatory intent because of her race, gender or age.  Def. 56(a)(1) Statement ¶ 25.  They further claim that, at least in the past thirteen years when Pannozzo has held the position of Human Resources Director, there is no person named Michael Connor who has ever received an administrative job or acted as an administrator in the Bridgeport school system.  Defendants' Reply to Plaintiff's Amended Local Rule 56(a)(2) Statement of Disputed Facts [Doc. #37] (hereinafter "Def. Reply to Pl. Am.56(a)(2) Statement") ¶¶ 24, 32.

The parties dispute the involvement of Pannozzo in the hiring decision for the position of Director.  According to the Defendants, Pannozzo was not involved in nor did she possess decision-making authority with respect to any of John's applications for Director, and she never discussed John's qualifications for any of the positions for which she applied with the members of the April 2007 interview panel, the Superintendent, or any employees or members of the Board of Education.  Def. 56(a)(1) Statement ¶¶ 34-37.  The Defendants further claim that unless Pannazzo is a member of the interview panel for a particular applicant, the only involvement she has in hiring for administrative positions is conducting an initial-prescreening of applications prior to interviews to make sure all applicants that are scheduled to interview possess the necessary minimum qualifications as stated in the published

job posting.  *Id.* ¶ 38.  Thus, the only decision Pannazzo may have made was that John had met the minimum requirements and should be placed on the list of interviewees.  The Defendants assert that the only entities with decision-making authority to hire the Director are the Board of Education and the Superintendent.  *Id.* ¶ 40.

On the other hand, John contends that Pannozzo grants interviews to applicants and sets policy with respect to hiring decisions for open positions by providing interview procedures and directing interview panels to follow those procedures.  Pl. Am. 56(a)(2) Statement ¶ 27, 36-38.  John further asserts that Pannozzo purposely scheduled her interview so that she would have no time to prepare, having provided notice of the interview time to John only one day before the interview took place.  *Id.* ¶ 27.  She does not state how much time any other applicant received to prepare for the interview.

In addition to her application for the position of Director, John applied for three other administrative positions in the Bridgeport school system:  Principal of Harding High School, Assistant Principal of Central High School, and Assistant Principal of Cesar Batalla School.  Def. 56(a)(1) Statement ¶ 41.  John was not hired for any of these positions.  *Id.* ¶ 42.  Also, on September 9, 2007, John applied for the position of Principal of James J. Curiale elementary school, but was not hired for the position.  Pl. Am. 56(a)(2) Statement ¶ 21.  The Defendants assert that John was not hired for this position before she did not have the necessary five years of administrative experience that was required.  Def. Reply to Pl. Am.56(a)(2) Statement ¶ 33.

In support of her allegation that the Bridgeport Board of Education had a policy or custom of refusing to promote older, black female employees, John asserts that various other unqualified white individuals were hired for the administrative positions that John applied for and for which she was better qualified. Pl. Am. 56(a)(2) Statement ¶¶ 43-45. However, she does not identify these individuals and provides no information regarding their qualifications for any of the administrative positions, nor does she indicate who was responsible for making the hiring decisions or what process was used. John also contends that another unnamed qualified black applicant was also not hired for an unidentified position. *Id.* ¶¶ 43, 45-46. John claims that she was the only person who had the certifications to qualify for these administrative positions and accuses Pannozzo of making decisions that impacted her income and retirement even though she did everything possible to qualify for an administrative position. *Id.* ¶¶ 44-45.

In or around January of 2006, John was approached by then-principal of Central High School, Dr. Orr, and they mutually agreed that John would serve as Coordinator of the Physical Education Department (hereinafter the "Coordinator") at Central High School. Def. 56(a)(1) Statement ¶ 47. The Coordinator is a teacher from the Department who acts as a point person with respect to communications between the Department and the Central High School Administration. *Id.* ¶ 48. There is no published job description for the Coordinator, and it is not in fact a position within the table of organization in the Bridgeport school system. *Id.* ¶ 49. The Coordinator does not receive additional monetary compensation or any other benefits. *Id.* ¶ 54. The Coordinator is not required to work different, additional, or fewer hours than any other teacher in the Department. *Id.* ¶ 55. The Coordinator

has no ability to discipline the other teachers in the Department, and does not evaluate the performance of any of the other teachers in the Department. *Id.* ¶¶ 56, 58. The Coordinator has no additional duties during the summer or when school is not in session. *Id.* ¶ 62.

Apart from the foregoing undisputed facts, the parties dispute the nature and job responsibilities of the Coordinator position. The Defendants contend that the Coordinator is at the same level as all other teachers in the Department, and that the Coordinator's sole function is to act as a liaison and communicate with Central High School administrators on behalf of the Department. *Id.* ¶¶ 50-51; Def. Reply to Pl. Am. 56(a)(2) Statement ¶¶ 42-48. The Defendants further indicate that, in her role as Coordinator, John undertook the task of collecting the results of physical fitness tests and providing them to the Director. Def. 56(a)(1) Statement ¶ 51. However, the Defendants claim that the collection of test results was not a required job responsibility, but instead that John took the responsibility on her own initiative and tried to impose it on the Department. *Id.* ¶ 52. The Defendants assert that the Coordinator has no other substantive duties, and has no authority over the other teachers in the Department. *Id.* ¶¶ 53, 57-59. According to the Defendants, the only purpose of any meetings organized by John as Coordinator was to engage the teachers in a cooperative group discussion to try to improve the Department and that the Coordinator was not required to hold any meetings of the Department at all. Def. 56(a)(1) Statement ¶¶ 60-61.

John denies these claims, alleging that the Coordinator position is "more prestigious" than that of a mere teacher and that the Coordinator is responsible for implementing activities in the Department and communicating with the Principal and

other Coordinators at Central High School. Pl. Am. 56(a)(2) Statement ¶¶ 50-51, 53. John also contends that as Coordinator she was required to collect data from other instructors regarding the results of physical fitness tests. *Id.* ¶ 52. Additionally, John asserts that the Coordinator was responsible for making sure gym classes were operated safely and that if a safety issue arose, the Coordinator would organize a meeting that all teachers in the Department were required to attend. *Id.* ¶ 53. The record is devoid of any official school records pertaining to the existence or duties of the Coordinator position.

Throughout the period of time when John served as Coordinator, the other teachers in the Department were not in agreement with John about her ideas for the Department. Def. Rule 56(a)(1) Statement ¶ 63. The Defendants claim that the disagreement resulted from John's attempts to impose her own new plan regarding Department curriculum on other teachers, which constituted a change from methods used by previous Coordinators. *Id.* ¶¶ 64-65. According to the Defendants, John's attempt to modify or influence other teachers' curriculum was not an appropriate use of her Coordinator role, and caused resentment and friction within the Department. *Id.* ¶¶ 66-67. The Defendants claim that John was aware that the other teachers in the Department did not like her as Coordinator and that there was disharmony in the Department because of her methods. *Id.* ¶ 79.

In response, John alleges that the disagreements were the result of discrimination by other teachers on the basis of her race, age, and gender. She claims that white physical education teachers initially complied with her requests, but then disregarded memos she sent to them, refused to submit data directly to her, refused to follow her directives, acted insubordinately toward her, and held

meeting and made decisions without involving her.  Pl. 56(a)(1) Statement ¶ 79.
John also asserts that white physical education teachers have unsafely thrown
equipment at her rather than politely handing it to her, and that they have behaved
in a similar insubordinate manner with a former black Coordinator while following
the directives of a former white Coordinator.  *Id.*  She does not identify these former
Coordinators.  John further alleges that disagreement among similarly situated
teachers in other Departments occurred, but that she was the only Department
Coordinator removed from her position.  *Id.* ¶ 89.  Again, she does not identify these
other Coordinators or the nature and circumstances of the disagreements.  John
admits that, prior to becoming Coordinator, she had a pleasant working relationship
with the other teachers in the Department, with no personal problems.  Def. 56(a)(1)
Statement ¶ 84; Pl. 56(a)(2) Statement ¶ 84.

Ortiz, who began serving as Principal in September of 2006, received
complaints from the other teachers in the Department about John's behavior as
Coordinator.  Def. 56(a)(1) Statement ¶¶ 68-69.  Specifically, Ortiz was told that John
was attempting to inappropriately assume responsibilities and exert control over the
Department, as she did not possess any more authority in those areas than the
other teachers in the Department.  *Id.* ¶ 70.

A meeting was held in or around August 2007 between Ortiz, John, and the
other teachers in the Department, in which the teachers expressed that they had a
problem with John being Coordinator.  *Id.* ¶ 71.  Ortiz gave the teachers the
opportunity to express their concerns, and then asked if any of the other teachers
wanted to be the Coordinator.  *Id.* ¶ 72.  However, none of the other teachers wanted
to act as the Coordinator.  *Id.* ¶ 73.  Ortiz then agreed that John should continue as

Coordinator, and indicated that he thought it would be a positive experience for John's leadership skills and professional growth. *Id.* ¶ 74.

During the 2007-2008 school year, John continued to try to have meetings regarding her plan for the Department, but those meetings continued to be unsuccessful or did not occur because the teachers were not cooperative with her ideas. *Id.* ¶ 75. There was one teachers' meeting which was very contentious because the other teachers did not agree with John, and which ended with one of the teachers becoming angry and calling the Director to come over to the school. *Id.* ¶ 76. Thereafter, John did not have any other meetings with the other teachers and instead began emailing them about things she needed from them. *Id.* ¶ 77. Specifically, she requested that the teachers provide her with the results of the students' physical fitness tests so that she could give them to the Director. *Id.* John tried to convene additional meetings, but the teachers would not respond. *Id.* ¶ 78. Ortiz did not instruct the other teachers to attend meetings with John or comply with her requests, nor did he discipline them when they failed to do so. Pl. Am. 56(a)(2) Statement ¶¶ 89, 94.

Meanwhile, the other teachers in the Department continued to complain to Ortiz about John's approach as Coordinator. Def. 56(a)(1) Statement ¶ 80. Ortiz discussed these complaints informally with John and other members of the Department, but the problems did not resolve. Def. Exh. 6, Ortiz Aff. ¶ 26. The Defendants contend that the situation culminated on or about April 2, 2008, when Ortiz told John that, although she had good methods, intentions, and ideas about the Department, she should refrain from directly addressing other teachers as Coordinator because other teachers were unhappy with her approach. Def. 56(a)(1)

Statement ¶ 81.  The Defendants claim that, as of this conversation, John was no longer acting as Coordinator.  *Id.* ¶ 82.  John denies this allegation, asserting that Ortiz told her that other instructors did not want to submit data to her and that he changed her duties to exclude collecting data as one of her responsibilities, but that Ortiz did not state that there were any performance issues relating to her ability to serve as Coordinator.  Pl. Am. 56(a)(2) Statement ¶ 81.

Following their conversation on April 2, 2008, John sent Ortiz a letter which notified Ortiz that she had previously filed a complaint with the CHRO complaining of employment discrimination.  Def. 56(a)(1) Statement ¶ 83.  It is undisputed that Ortiz was unaware that John had filed any complaints with the CHRO before he received the letter on April 2, 2008.  *Id.*; Pl 56(a)(2) Statement ¶ 83.  After receiving the letter, Ortiz requested that John see him with union representation present because, according to the Defendants, it was necessary for union representation to be present when he addressed her employment discrimination claims.  Def. 56(a)(1) Statement ¶¶ 101-02.  John claims that this meeting took place in June of 2008, two months after she informed Ortiz that she had filed a CHRO claim, and that she was removed from the Coordinator position at that time.  Pl. Am. 56(a)(2) Statement ¶¶ 82-83.  However, John's assertion that she was not removed from the Coordinator position until June 2008 is contradicted by her April 2, 2008 letter.  Def. Exh. 7.  In the letter, John summarized statements made by Ortiz during their conversation earlier that morning, and confirmed that Ortiz told her "that because [he] had not put the official appointment [as Coordinator] in writing, it was not valid, and there was not going to be a physical education coordinator."  *Id.*  The letter further informed

Ortiz that John "consider[ed] this to be a demotion and another change in the terms and conditions of my employment." *Id.*

The parties dispute the reasons for John's removal as Coordinator. The Defendants contend that Ortiz' removal of John as Coordinator was not based on any discriminatory intent or motive based on her membership in any protected class such as race, ethnicity, gender or age, and that none of the other teachers in the Department expressed any discriminatory animus against John because of her race, gender, age or membership in any other protected class. Def. 56(a)(1) Statement ¶¶ 89, 91, 94. John admits that she never heard any of the other teachers in the Department make racial or gender based comments about her or anyone else. *Id.* ¶ 86; Pl. 56(a)(2) Statement ¶ 86. The Defendants further contend that Ortiz did not remove John because any teachers in the Department requested it or influenced him to do so. Def. 56(a)(1) Statement ¶ 90. In addition, the Defendants assert that none of Ortiz' actions were taken in retaliation for John's employment discrimination complaints. *Id.* ¶ 99. Instead, they claim that John was removed because of the substantial friction and disharmony within the Department that her actions were causing. *Id.* ¶ 90. According to the Defendants, the Board of Education has an anti-discrimination policy which it provided training on at all times relevant to John's claims, and that Ortiz acted in accordance with that policy. *Id.* ¶¶ 103-104.

John contends, on the other hand, that Ortiz acted with discriminatory intent because she was the only African American person in the Department and she was the oldest member of the Department. Pl. Am. 56(a)(2) Statement ¶ 89. The Defendants deny this statement, asserting that Charles Adams, an African American

male, was the oldest person in the Department until his retirement in June of 2007. Def. Reply to Pl. Am. 56(a)(2) Statement ¶¶ 39-40. John also contends that Ortiz never disciplined white physical education teachers for failing to following her directives, and that he changed her job duties by not allowing her to directly collect physical fitness data from white physical education teachers. Pl. Am. 56(a)(2) Statement ¶ 89. In addition, John asserts that Ortiz claimed that the Department did not have enough teachers to warrant having a Coordinator even though other smaller departments had one and that he had never eliminated other Department Coordinators even though disagreements among similarly situated teachers in other departments had occurred. *Id.* John further asserts that Ortiz interfered with her right to contract with the Board of Education, through her union, by stunting her professional growth and development through an illegal discriminatory and retaliatory demotion in a hostile work environment. *Id.* Finally, John claims that she was removed from her position as Coordinator two months after she informed Ortiz that she had filed a claim with the CHRO. *Id.* ¶ 99.

To date, Ortiz has not appointed any other teacher in the Department to serve as Coordinator. Def. 56(a)(1) Statement ¶ 92. The appointment to or removal from a Department Coordinator position is at the sole discretion of the Principal; in this case, Ortiz. *Id.* ¶ 95. Ortiz also has the sole discretion to determine whether a Coordinator is necessary for any Department at all. *Id.* ¶ 96. According to the Defendants, Ortiz has not appointed any other teacher to serve as Coordinator because the size of the Department does not require a Coordinator, none of the teachers are interested in the position, and because it would create friction between teachers in the Department. *Id.* ¶ 93. The Defendants claim that other Department

Coordinators have not caused friction or disharmony within their Departments and thus it has not been necessary to remove them; however, if another Department was experiencing similar problems because of their Department Coordinator, the Defendants claim that Ortiz would remove the Coordinator and decide whether to appoint another person in their place.  *Id.* ¶¶ 97-98.  In response to these assertions, John contends that virtually all departments have Coordinators, including those smaller than the Physical Education Department, but that Ortiz has never eliminated other Coordinator positions despite unspecified disagreements between teachers and Coordinators she conclusorily describes as similarly situated to her.  Pl. Am. 56(a)(2) Statement ¶ 93.

## II. STANDARD OF REVIEW

"The standards governing summary judgment are well-settled."  *Ford v. Reynolds*, 316 F.3d 351, 354, 379 (2d Cir. 2002).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," and it should be interpreted so as to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Rule 56(e) of the Federal Rules of Civil Procedure "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact."  *Id.* at 324 (internal quotation marks omitted).  "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the

kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves[.]" *Id.*

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Id.* at 323. "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Ford*, 316 F.3d at 354. "[T]he burden on the moving party may be discharged by 'showing' – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *PepsiCo.Inc., v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). While evidence produced by the party opposing summary judgment need not be in a form that would be admissible at trial, its content must nonetheless be admissible. *Celotex*, 477 U.S. at 324; *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001).

### III. DISCUSSION

#### A. Discriminatory Treatment in Employment under Title VII, CFEPA and ADEA

John alleges that the Defendants discriminated against her by denying her promotions and by removing her from her position as Coordinator on the basis of her age, race and gender. Compl., Counts One, Two and Four. John's claims of discriminatory treatment in employment based on her race and gender under Title

VII and the CFEPA are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Craine v. Trinity College*, 259 Conn. 625, 637 n. 6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both."). Claims brought under the ADEA are also evaluated under the *McDonnell Douglas* framework. *See e.g., D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 194-195 (2d Cir. 2007).

With respect to her failure to promote claims, the *McDonnell Douglas* standard first requires John to establish a *prima facie* case of discrimination by showing: "(i) that [s]he belongs to a racial minority [or other protected class]; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp.*, 411 U.S. at 802. The Second Circuit has characterized John's burden at the *prima facie* stage as "minimal" and "de minimis." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

If John can establish her *prima facie* case, the burden then shifts to the Defendants to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802. At this stage, the Defendants need only proffer, not prove, the existence of a nondiscriminatory reason for their employment decision. *See Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). "This burden is one of production, not persuasion; it

can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

If the Defendants' meet their burden of production, the burden shifts back to John to show that the legitimate, nondiscriminatory reason offered by the Defendants is mere pretext for illegal employment discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804; *Burdine*, 450 U.S. at 256. John must be given a "full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 256. "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (citation and quotation marks omitted).

Under the *McDonnell Douglas* standard, John has established a *prima facie* case of employment discrimination with respect to her claim for failure to promote her to the position of Director. As an African-American woman over the age of sixty, she belongs to a protected class, it is undisputed that her education, certifications and work experience qualified her for the position of Director which she did not receive, and the position was eventually filled by a white male[2] giving rise to an inference of discrimination. *See Zimmerman v. Associates v. Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (*"*The evidence necessary to satisfy this initial burden [is] minimal . . . the mere fact that a plaintiff was replaced by someone outside the

---

[2]  John identifies the person hired for the position as Michael Connor. The Defendants contend that there is no record of an individual by this name having worked as an administrator in the Bridgeport school system. The Defendants do not, however, dispute that the individual ultimately hired for the Director position is a white male. Therefore, the Court will assume for purposes of this motion that John simply made a clerical or typographical error when using the name Michael Connor.

protected class will suffice for the required inference of discrimination at the *prima facie* stage of Title VII analysis.").

Therefore, the burden shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for why she was not hired for the position. John was interviewed by a panel of individuals of different races and genders, none of whom are named as defendants in this case. All seven applicants for the position, including John, were scored by the interviewers on a scale of one to five, with one being the lowest score and five being the highest score. In order to move on to a second round interview with the Superintendent, a candidate needed to have received a composite score of three or higher in the first round interview. John received a score of "one" from four of the interviewers and a score of "two" from the fifth, and therefore did not qualify to move on to the next round. Thus, the Defendants have met their burden of articulating a nondiscriminatory reason for their decision not to hire John as Director by proffering that the interview panel did not give her the requisite score to move forward to a second round interview.

The burden therefore shifts back to John to demonstrate that the reason proffered by the Defendants is mere pretext for discrimination. John has failed to meet this burden. There is no direct evidence of discrimination in this case. John has not alleged that anyone in the Bridgeport School System who played a role in the decision not to promote her ever made any comments regarding her race, gender or age, or took any actions indicating racial, gender or age-based animus. Instead, John claims that she was not promoted to the Director position despite being the most qualified candidate, and that a less qualified white male was hired for the position. From this, she asks the Court to draw the conclusion that her

failure to be promoted must have been based upon discrimination.  John's assertion that she was the most qualified for the position is based on her educational degrees in Physical Education and Education Administration, her certifications, her satisfactory evaluations as a physical education teacher, the length of her teaching career as a physical education instructor and her seniority in the Physical Education Department at Central High School.  However, her claim is unfounded as she has produced no information regarding the other six applicants for the position including their names, whether they belong to a protected class and their qualifications.  Likewise, she has failed to produce any evidence that Connor's education and prior work experience made him less qualified than her and, in fact, she has not adduced any information at all regarding his qualifications for the position in support of her claim of pretext.   Without information regarding other applicants' qualifications, John's conclusory statement that she was the most qualified candidate for the position and her unhappiness with her interview score and the subsequent outcome does not suffice to demonstrate a pretext for illegal employment discrimination.  *See, e.g.*, *Byrnie v. Town of Cromwell Public Schs.*, 73 F. Supp. 2d 204, 214 (D. Conn. 1999), *rev'd on other grounds*, 243 F.3d 93 (2d Cir. 2001) (holding that plaintiff's own opinions about his qualifications "fall short of establishing a dispute about the genuineness of the Selection Committee's assessment of his qualifications"); *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) ("It is well settled . . . that a plaintiff's own opinions about her work performance or qualification do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions.").

John also contends that the interview process was flawed in terms of scoring and evaluating candidates and did not conform to official Board of Education policy. However, she does not establish how it failed to conform to policy nor does she allege any specific instances of deficiencies in her interview or inappropriateness in her scoring or evaluation.  Moreover, the fact that all six other candidates from the initial round of interviews, each of whom was a white male, were also scored poorly by the interviewers and failed to advance to the second round indicates that white male applicants did not receive preferential treatment during the interview process. John has introduced no evidence to demonstrate that the interview procedure and the scores she received during her interview were mere pretext for a discriminatory employment action.

Furthermore, John's allegation that Pannozzo deliberately scheduled her interview to prevent her from having enough time to prepare does not demonstrate that her low interview score was a pretext for discrimination. John has not shown that Pannozzo was significantly involved in the interview and hiring decision-making process for the position.  Pannozzo's only involvement with hiring for the position was to pre-screen applicants to ensure they had the necessary prerequisites to attain an interview with the panel, schedule candidates for interviews and provide panelists with the interview procedures used by the Human Resources Department.  However, she did not take part in the interviewing, scoring or evaluation of John and she did not discuss John's qualifications with anyone on the panel.  Moreover, John has offered no evidence that Pannozzo's alleged action of scheduling her interview without leaving her sufficient time to prepare was motivated in any way by John's race, gender or age.  The ultimate burden of

persuasion remains at all times with John. John has failed to produce sufficient evidence to meet her burden of showing that the Defendants intentionally discriminated against her by not hiring her for the position of Director.

John further claims that the Defendants discriminated against her by refusing to hire her for various other administrative positions within the Bridgeport School System for which she applied, including Principal of Harding High School, Assistant Principal of Central High School, Assistant Principal of Cesar Batalla High School, and Principal of James J. Curiale Elementary School. However, she has failed to produce sufficient evidence to satisfy even her *prima facie* burden of demonstrating facts giving rise to an inference of discrimination with respect to these positions, much less her ultimate burden of persuasion. While John conclusorily asserts that she was qualified for these positions by virtue of her education and employment history, she has produced absolutely no evidence regarding the necessary qualifications for these positions. Similarly, she has produced no information at all regarding the hiring process for any of these positions, of who makes the hiring decisions, or of what criteria or factors are used in making the hiring decisions. Further, while John summarily asserts that the individuals hired for these positions were "unqualified white males," she does not even identify any of them much less produce any evidence regarding their qualifications.[3]

_____

[3]  The Plaintiff asserts that Connor was hired as Principal of James J. Curiale Elementary School, but that he could not accept the position because he did not have sufficient teaching experience. Thus, by the Plaintiff's own admission Connor in fact was ultimately not hired for this position. Furthermore, the Plaintiff has produced no evidence of Connor's qualifications, apart from her conclusory assertion that he lacked sufficient teaching experience. Therefore, this claim is immaterial to the analysis.

John also vaguely refers to another African American teacher named "Denise" who she claims had a similar experience of not being hired for an administrative position because of her race and age.  However, John was unable to even identify this teacher's last name or any of the positions to which she applied, much less recount any specifics of her experience.  Therefore, given the absence of supporting evidence, John's contention that she was not hired for these administrative positions due to her race, gender or age is entirely subjective and speculative and cannot give rise to liability under Title VII, the CFEPA, or the ADEA.  *See Davis v. Verizon Wireless*, 389 F. Supp. 2d 458, 469 (W.D.N.Y. 2005) ("It is well settled that for a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must do more than present conclusory allegations of discrimination . . . he or she must offer concrete particulars to substantiate the claim.") (citation and internal quotations marks omitted).

Finally, John claims that the Defendants discriminated against her by removing her from the Coordinator position.  In order to make out a *prima facie* case of discrimination based upon her removal from this position, John must show that: "(i) [s]he is a member of a protected class; (ii) [s]he was qualified for the position; (iii) [s]he was subjected to an adverse employment decision; and (iv) either the position remained open or [s]he was replaced by someone not a member of [her] protected class."  *De la Cruz v. New York City Human Resources Admin.*, 82 F.3d 16, 20 (2d Cir. 1996) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).  There is no dispute with respect to the first and fourth elements, as John is a member of a protected class and the position remained open after she was removed from it.  With respect to the second element, the Defendants' statement of facts can fairly be read

to assert that Ortiz removed John from the position of Coordinator because she lacked the key skill of leadership. However, the Defendants do not explicitly make this argument in their brief and, moreover, at the *prima facie* stage a plaintiff need show only that she possesses the "basic skills necessary for the performance of her job." *Powell v. Syracuse*, 580 F.2d 1150, 1155 (2d Cir. 1978). Therefore, the Court will not rest its decision on this basis.

With respect to the third element, the Defendants have submitted evidence that the Coordinator position was merely a title with no concomitant benefits or responsibilities, apart from acting as a liaison to and communicating with Central High School administrators on behalf of the Physical Education Department. John disputes this, stating that the Coordinator position is "more prestigious" than that of a teacher and that she had additional job responsibilities including the collection of data from other teachers regarding the results of physical fitness tests, organizing teachers' meeting, and ensuring that gym classes were being run safely. To be adverse, an employment action must involve the deprivation of "'some tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir. 1994)). For purposes of the instant motion, the Court will credit John's claim that removal from the position of Coordinator altered the terms, conditions or privileges of her employment and therefore constituted an adverse employment action. Accordingly, John has satisfied the elements of her *prima facie* case, and the burden shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for removing her from the Coordinator position.

The Defendants have satisfied their burden.  They have submitted proof that Ortiz received numerous complaints from other teachers in the Department regarding John's managerial style and methods as Coordinator, which resulted in friction and disharmony within the Department.  During a meeting in August 2007, Ortiz attempted to intervene in the situation, but his effort was unsuccessful and the complaints from other teachers continued.  Ultimately, Ortiz made the decision to remove John from the Coordinator position on April 2, 2008.  The reason given by the Defendants for John's removal is confirmed by a letter from John herself on the same date, in which John recounted a conversation in which Ortiz stated that he believed there was a "rift" within the Department and "did not want it to continue."  Def. Exh. 7.  Since John's primary function as Coordinator was to act as a liaison between the Department and Central High School administrators, it cannot be disputed that a breakdown in communication between John and other teachers in the Department constituted a legitimate reason for her removal from the position.  *See Scaria v. Rubin*, 117 F.3d 652, 54-55 (2d Cir. 1997) (stating that the Court's role is not to sit as a "super-personnel department that reexamines an entity's business decision") (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).

John attempts to demonstrate that the reason given by the Defendants is pretextual by claiming that the other teachers in the Department disregarded her emails, did not provide her with physical fitness test results, refused to follow her directives, set up meetings and made decisions without her, acted insubordinately to her, and unsafely threw equipment at her.  However, without more, there is nothing about this conduct that gives rise to an inference of discrimination.  John admits that she never heard any member of the Department make discriminatory

comments about her or anyone else, and the record is devoid of any direct evidence of racial, gender or age-based animus. To the contrary, John admits that prior to becoming Coordinator, she had a pleasant working relationship with other teachers in the Department, and had no personal problems with them. This lends credence to the Defendants' claim that it was John's conduct as Coordinator that caused friction in the workplace, not her protected class status.

John contends that discriminatory animus may be inferred because teachers cooperated with previous Coordinators who were white, and also because Ortiz never removed Coordinators in other Departments from their positions despite there being disagreements within the Departments. However, as with most of John's assertions, this claim is speculative and unsupported. She provides no information regarding the identities of the previous Coordinators, when they served, whether the same teachers worked at Central High School at the time, or their methods and approach on the job. Similarly, she fails to elaborate at all on the circumstances present in other Departments. Indeed, she was unable to say during her deposition whether the discord in other Departments had anything to do with the Coordinator, rendering her assertion of disparate treatment unfounded in fact and conclusory. Pl. Exh.3 at 114. Although circumstantial evidence may support a discrimination claim in appropriate circumstances, the evidence in this case is insufficient to create a genuine issue of matter fact for the jury. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) ("[A] jury cannot infer discrimination from thin air. Plaintiffs have done little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race. This is not sufficient.").

Therefore, summary judgment is granted for the Defendants as to John's discrimination claims under Title VII, the CFEPA and the ADEA.

### B. Hostile Work Environment

John next alleges that her removal from the Coordinator position "created a hostile work environment, and a painful, humiliating and embarrassing situation for the Plaintiff" in that she "was segregated from the other employees and she was treated differently and less favorably than the other program coordinators." Compl.¶ 43.

Title VII and the CFEPA makes it unlawful for an employer to subject individuals to a discriminatorily hostile or abusive work environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993); 42 U.S.C. § 2000e-2(a)(1).[4] To prove that a workplace is actionably "hostile" under Title VII, a plaintiff must demonstrate that: (1) she "subjectively perceive[d] the environment to be abusive;" (2) the conduct was so "severe or pervasive" that it created an "objectively hostile or abusive work environment", meaning "an environment that a reasonable person would find hostile or abusive;" and (3) the conduct created an environment abusive to employees "because of their race, gender, religion or national origin." *Harris*, 510 U.S. at 21-22.

The Supreme Court has established a non-exhaustive list of factors relevant to determining whether a given workplace is so severely or pervasively hostile as to support a Title VII claim. These include "the frequency of the discriminatory

_____

[4]  In interpreting the CFEPA, Connecticut courts look to federal case law interpreting Title VII of the Civil Rights Act. *Brittell v. Dep't of Correction*, 247 Conn. 148, 164 (1998). Accordingly, the standards governing a hostile work environment claim under the CFEPA are the same as those governing a claim under Title VII. *Id.* at 165-68.

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether the conduct unreasonably interfered with plaintiff's work; . . . whether it unreasonably interferes with the employee's work performance[;]" and "[t]he effect on the employee's psychological well-being[.]" *Id.* at 23.

To determine "whether an environment may be considered sufficiently hostile or abusive to support [a Title VII claim]," courts must consider "the totality of the circumstances." *Williams v. Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (citing *Harris*, 510 U.S. at 23). The factors outlined above must be evaluated "cumulatively" so that the Court can "obtain a realistic view of the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citations omitted). This includes evaluating the "quantity, frequency, and severity" of the discriminatory incidents. *Id.* "In order to meet [her] burden, the plaintiff must show more than a few isolated incidents of racial enmity[.]" *Williams*, 171 F.3d at 100. Instead, the plaintiff "must establish that [her] workplace was permeated with instances of racially discriminatory conduct such as 'discriminatory intimidation, ridicule, and insult,' such that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.'" *Id.* (citations omitted).

The Court holds that John's hostile work environment claim fails as a matter of law. John has not alleged, nor has she provided evidence of, even a single racial or gender-based comment or instance of discriminatory intimidation, insult or ridicule that occurred in her workplace. Instead, she asks the Court to infer that every perceived slight she experienced in workplace, including the Defendants' failure to promote her, the complaints of other teachers regarding her actions as

Coordinator, and her removal from the Coordinator position, were motivated by race and/or gender and therefore created a hostile work environment. However, as explained above in Section III.A, John has failed to meet her burden of demonstrating that the Defendants intentionally discriminated against her on the basis of her membership in any protected class. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998) (a plaintiff asserting a hostile work environment claim "must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted" discrimination because of membership in the protected class); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic."). While facially neutral incidents may be included among the "totality of circumstances" that courts consider in analyzing a hostile work environment claim, this requires "some circumstantial or other basis for inferring that incidents [race or] sex-neutral on their face were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002). No such basis exists here.

Furthermore, the acts of which John complains were not sufficiently "severe or pervasive" so as to "alter the conditions of the victim's employment and create an abusive working environment . . . ." *Harris*, 510 U.S. at 21. John claims that she suffered humiliation when she was not hired for the position of Director as well as the other administrative positions to which she applied. However, she was not automatically entitled to a promotion, and she has produced no evidence regarding

the qualifications of the individuals ultimately hired for these positions.  John further complains that, during the more than two-year period she served as Coordinator, other physical education teachers refused to submit data regarding physical fitness test results to her, refused to follow her directives, and set up meetings and made decisions without her involvement.  While the refusal of other teachers to cooperate with John may have offended her, these actions do not rise to the level necessary to establish a hostile work environment and, moreover, there is no evidence that John was treated badly by other teachers because of her race or gender.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (stating that Title VII is not a "general civility code for the American workplace."); *see also Nieves v. District Council 37, AFSCME*, No. 04-CV-8181(RJS), 2009 WL 4281454, at *1-3 (S.D.N.Y. Nov. 24, 2009) (holding that plaintiff had failed as a matter of law to establish a hostile work environment claim where evidence showed that, over a roughly one-year period, her supervisor (a) constantly commented on her physical appearance; (b) sent her e-mails containing pornography; (c) inserted his fingers into a condom and then waved them in the area of the plaintiff; (d) blew kisses at her; (e) "jokingly" asked her to take a nude picture of him; (f) instructed her to open a drawer he knew to be filled with condoms; and (g) made five comments about how plaintiff would stay in the same room as a male colleague during a business trip); *Celestine v. Petroleos de Venezuella*, 266 F.3d 343, 354 (5th Cir. 2001) (holding that eight incidents of racial harassment over a twenty-five month period were not sufficiently severe or pervasive to create a hostile work environment).  Furthermore, John has presented no evidence regarding the frequency of these alleged instances of bad treatment by other teachers.  John also

attempts to create an issue of material fact by claiming that other teachers "unsafely threw equipment" at her, but she fails to elaborate upon this conclusory assertion in any way. Finally, John asserts that she was subjected to a hostile work environment when Ortiz removed her from the Coordinator position. However, being removed from a position (or stripped of a title) because of conflicts with other teachers, without any resulting decrease in pay or benefits, does not create an environment that a reasonable person would find hostile or abusive.

In sum, based upon the totality of the circumstances, the evidence before the Court does not demonstrate that the environment in which John worked may be considered by a reasonable jury to be sufficiently hostile or abusive to support a Title VII claim. Therefore, the Defendants are entitled to summary judgment with respect to this claim.

### C. Retaliation under Title VII and CFEPA

John alleges that the Defendants retaliated against her for filing a complaint with the CHRO in which she asserted employment discrimination. Compl. ¶¶ 1-2. The anti-retaliation provision of Title VII prohibits an employer from discriminating against an employee because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C. §2000e-3(a). The "order and allocation of burdens of proof" in retaliation cases under Title VII are analyzed using the *McDonnell Douglas* framework. *Sumner v. U.S. Postal Service*, 899 F.2d 203, 208 (2d Cir. 1990). Similarly, the Connecticut Fair Employment Practices Act (CFEPA) prohibits employers from discriminating against an employee on account of their opposition to "any discriminatory employment practices or because such person

has filed a complaint [with the CHRO]." Conn. Gen. Stat. § 46a-60 (a)(4). The intent of the Connecticut legislature in adopting the CFEPA was to make the statute coextensive with Title VII; therefore, Connecticut courts look to federal case law for guidance in interpreting this provision of the CFEPA. *State v. Commission on Human Rights and Opportunities*, 211 Conn. 464, 470 (1989).

To establish a *prima facie* case of retaliation under Title VII or the CFEPA, a plaintiff must make four showings: (1) that she was engaged in "protected activity"; (2) that her employer was aware of that activity; (3) that she suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Manoharan v. Columbia Univ. Coll.Of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination," which is satisfied here by John's filing of a complaint with the CHRO on June 14, 2007. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000); *see also* 42 U.S.C. §2000e-3(a); Conn. Gen. Stat. § 46a-60(a)(4).

To satisfy the second prong of the standard, John must prove that the individual alleged to have engaged in a retaliatory act was specifically aware of her participation in the protected activity at issue. *See e.g.*, *Fisher v. Town of Windsor*, No. 3:94CV02050 AHN, 1997 WL 76669, at *4-5 (D. Conn. Feb. 7, 1997) ("there must be some facts in evidence supporting an inference of actual knowledge"); *Long v. AT&T Information Systems, Inc.*, 733 F. Supp. 188, 206 (S.D.N.Y. 1990) (dismissing retaliation claim because plaintiff failed to establish that the individuals who fired him had any knowledge of plaintiff's EEOC complaint filed three weeks prior to termination).

The third prong requires John to establish that her employer's awareness of her protected activity caused an adverse employment action. An adverse employment action is a "materially adverse change" in the terms and conditions of employment, meaning one which "is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005) (citation omitted). Such adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). A failure to hire or promote can also support a claim of retaliation. *See Sellick v. Agency-Castle Point*, No. 09 Civ. 6616(DLC), 2010 WL 2813431, at *11 (S.D.N.Y. July 16, 2010). Additionally, "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action." *Richardson v. New York State Dept. of Correctional Services*, 180 F.3d 426, 446 (2d Cir. 1999) (reversing dismissal of retaliation claim when plaintiff produced evidence of harassment from co-workers after filing a lawsuit). As there are no bright-line rules for applying this standard, courts must determine on a case-by-case basis whether the challenged employment action reaches the level of "adverse." *Id.* The standard is an objective one. *See Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53, 71 (2006) ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.").

Finally, John must establish a causal connection between the protected activity and the adverse employment action.  John may establish this connection in one of the three following manners: (1) "indirectly by showing that the protected activity was followed closely by discriminatory treatment"; (2) through other indirect evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (3) directly through evidence of retaliatory animus directed against a plaintiff by the defendant."  *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (internal quotations omitted).  To establish a causal connection using the first method, the temporal proximity between an employer's knowledge of protected activity and the adverse employment action must be "very close."  *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  The Second Circuit has held that even a three-month gap between the protected activity and the adverse employment action may negate an inference of retaliation.  *See O'Reilly v. Consolidated Edison Co. of New York, Inc.*, 173 Fed. Appx. 20, 22 (2d Cir. 2006).

John argues that the Defendants retaliated against her for filing a complaint with the CHRO in two ways:  first, by not hiring her for various administrative positions, including Director of Physical Education and Principal of James J. Curiale High School; and second, by removing her from the Coordinator position.

John's first argument fails for multiple reasons.  John asserts that she was retaliated against for filing her CHRO complaint because she was not hired for the position of Director when it was reposted in September 2007.  However, John has not proffered any evidence that anyone with decision-making authority with respect to hiring had any knowledge of her CHRO complaint, and therefore she cannot establish a *prima facie* case of retaliation.  Moreover, even if she could establish a

*prima facie* case of retaliation based upon the rejection of her application in September 2007, the Defendants have articulated a legitimate reason for not hiring her and John has produced no evidence of pretext. John was previously interviewed for the Director position by a multi-racial and mixed-gender panel of interviewers to whom she ascribes no animus in April of 2007, before she filed her CHRO complaint, and she scored poorly on that interview. The fact that neither John nor any of the other interviewees in April 2007 scored high enough to move on to the next round prompted the Board of Education to repost the position. Clearly, if John failed to satisfy the criteria necessary for being hired for the position in April 2007, there is no basis for her to claim that she should have been interviewed again five months later in September 2007. Nor is there any evidence, direct or circumstantial, that the reason for her failure to be hired upon reapplying in September 2007 was a pretext for discrimination, rather than her poor performance during her interview.

In addition, John claims that she applied for the position of Principal of James J. Curiale Elementary School in September 2007, but that she was not hired despite being the most qualified person to apply. However, she has produced no evidence to show who the decision-makers were with respect to the hiring decision for this position, and there is no direct or circumstantial evidence that any person with decision-making authority was aware of her CHRO complaint. Further, there is no evidence to establish a causal connection between John's CHRO complaint and the decision not to hire her because, apart from her conclusory claim that she was the most qualified person for the position, there is no evidence as to what the necessary qualifications for the position were or of what qualifications other

applicants for the position had.  In light of the lack of concrete particulars regarding the hiring process for the Principal position, the gap of three months between John's filing of a CHRO complaint and the failure to hire her for the position does not suffice to establish a causal nexus.  Finally, even if John could establish a *prima facie* case, the Defendants have articulated a legitimate reason for not hiring her for this position, namely that she did not have the necessary five years of administrative experience required for the position, and John has offered no evidence of pretext.

John also vaguely references the Defendants' failure to hire her for other administrative positions as being done in retaliation for her CHRO complaint, but she does not state what specific positions she is referring to, what the qualifications for the positions were, who else applied for them and what their qualifications were, or even whether she applied for them before or after she filed her CHRO complaint. Therefore, she cannot maintain a retaliation claim based upon not being hired for any of these positions.

John's claim that she was retaliated against by being removed from the Coordinator position also fails.  The parties dispute the nature and responsibilities of the Coordinator position.  The Defendants claim that the Coordinator did not receive any additional compensation or benefits, had no authority over other teachers, and had no job responsibilities other than to act as a liaison between the Department and Central High School administrators.  They argue, therefore, that Ortiz' removal of John from the position did not constitute an adverse employment action.  John disputes this, claiming that the Coordinator position is "more prestigious" than that of a teacher, that she had additional job responsibilities

including collecting data regarding physical fitness tests and ensuring that gym classes were operated safely, and that she had the authority to require other teachers to attend a meeting if any issues arose.

However, this dispute is not material. Even assuming that Ortiz' removal of John from the Coordinator position constituted an adverse employment action, she still cannot establish a *prima facie* case of retaliation. It is undisputed that Ortiz, who had sole authority to appoint and remove Coordinators in Central High School, was not aware of John's CHRO complaint until John informed him of it in her April 2, 2008 letter. John attempts to create a genuine issue of material fact by asserting that she was not removed from the Coordinator position until June 2008, two months after she informed Ortiz that she had filed a CHRO complaint. This attempt is futile, however, because her assertion that she was not removed from the position until June 2008 is contradicted by her own April 2, 2008 letter, which was written after the conversation between John and Ortiz regarding her position as Coordinator. In the letter, John summarized statements made by Ortiz during their conversation earlier that morning, and confirmed that Ortiz told her "that because [he] had not put the official appointment [as Coordinator] in writing, it was not valid, and there was not going to be a physical education coordinator." Def. Exh. 7. The letter further informed Ortiz that John "consider[ed] this to be a demotion and another change in the terms and conditions of my employment." *Id.* Therefore, John's contemporaneous letter to Ortiz confirms the Defendants' claim that she was removed from the Coordinator position on April 2, 2008, before Ortiz had any knowledge of her CHRO complaint.

38

Moreover, assuming that John could establish a *prima facie* case of retaliation, her claim would still fail because the Defendants have stated that she was removed for the legitimate reason that she lacked the requisite managerial skills necessary to perform the Coordinator position and that her methods and conduct created friction and disharmony among the teachers in the Department, and John has failed to adequately demonstrate that this explanation is pretextual for all of the reasons stated previously. *See supra* Section III.A. No evidence has been presented that the any of the actions of other teachers that John complains of were prompted by any discriminatory animus based upon race, gender, age or John's filing of a CHRO complaint. Therefore the Defendants are entitled to summary judgment with respect to John's retaliation claims under Title VII and the CFEPA.

### D. 42 U.S.C. § 1983

John alleges that the Defendants deprived her of the right to equal protection and due process guaranteed by the Fourteenth Amendment to the United States Constitution and enforced by 42 U.S.C. § 1983. Compl. ¶ 58.

### 1. Equal Protection

The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985) (internal quotation marks omitted). In order to establish a claim for an equal protection violation, a plaintiff must show that a government actor intentionally discriminated against her "on the basis of race, national origin or gender." *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). In the employment context, a plaintiff must show that she

was "selectively treated compared with other similarly situated employees, and that selective treatment 'was based on impermissible considerations such as race[.]'" *Knight v. Connecticut Dep't of Health*, 275 F.3d 156, 166 (2d Cir. 2001) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)). In addition, a plaintiff must prove that the decision-makers in her case "acted with a discriminatory purpose." *Id.*

For an employee to be "similarly situated" for the purpose of establishing disparate treatment in an employment discrimination case, the individuals with whom the plaintiff attempts to compare herself must be similarly situated "in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). For instance, those employees"must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." *Mazella v. RCA Global Communications*, 642 F. Supp. 1531, 1547-48 (S.D.N.Y. 1986).

The analytical framework of a workplace equal protection claim parallels that of a discrimination claim under Title VII. *See Feingold v.New York*, 366 F.3d 138, 159 (2d Cir. 2004). Thus, an employment discrimination claim brought pursuant to the Equal Protection Clause is analyzed using the *McDonnell Douglas* burden-shifting framework. *Id., see also Gant v. Wallingford Board of Education*, 195 F.3d 134, 146 (2d Cir. 1999).

John's equal protection claim fails as a matter of law for all of the reasons discussed in the Court's analysis of her Title VII claims. There is insufficient

evidence that any of the conduct that John complains of relating to either her failure to be promoted or her removal from the Coordinator position was based upon discriminatory animus, rather than a legitimate business purpose.  Furthermore, John's equal protection claim is unavailing for the additional reason that she has not identified any similar situated employee who was treated differently than her in any material respect.  To the contrary, with respect to the hiring process for the position of Director, all seven interviewees, including John, were graded on the same scale using the same criteria, and none of those seven interviewees were awarded a high enough score to advance to the second round of interviews.  John attempts to create a genuine issue of material fact by asserting that Michael Connor, a white male, was ultimately hired for the position, but she does not provide any evidence regarding Connor's qualifications for the job in comparison to hers, and therefore cannot show that Connor was similarly situated in all material respects. With regard to the other administrative positions that John applied for, she has not identified any other applicants or their qualifications, nor has she identified what the necessary qualifications were, who the decision-makers were, what criteria were used in making the hiring decision, or who was ultimately hired.  Therefore, she cannot sustain an equal protection claim as to those positions either.  Finally, with respect to her removal as Coordinator, John conclusorily asserts that similarly situated Coordinators in other Departments were not removed despite there being disagreements within the Departments.  However, she does not provide any particulars regarding the circumstances in those other Departments, rendering her allegations speculative.  Therefore, summary judgment is granted in favor of the Defendants as to John's equal protection claim.

## 2. Due Process

"In order to sustain an action for deprivation of property without due process of law, a plaintiff must first identify a property right, second show that the state has deprived him of *that* right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub.Serv. Employees v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (internal quotation marks omitted). In the event of termination, the United States Supreme Court has held that an employee with a property right to continued employment must be afforded a pre-termination opportunity to respond to the charges against her coupled with a post-termination administrative procedure. *See Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 547-48 (1985).

As a tenured public school teacher, John has a legitimate claim of entitlement to her position under Connecticut law. *See O'Connor v.* Pierson, 426 F.3d 187, 197 (2d Cir. 2005) (citing Conn. Gen. Stat. § 10-151(d)). In this case, however, John is not claiming that her employment was terminated. Instead, she first contests her removal from the Coordinator position, and second complains about her failure to be promoted.

The Second Circuit has held that public employees have a property interest in a particular position or rank where demotion from that rank would result in lower pay and benefits. *See Ciambrello v. County of Nassau*, 292 F.3d 307, 317-18 (2d Cir. 2002). The Second Circuit has also held that due process protections extend to public employees who are suspended without pay. *See O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005). Here, however, it is undisputed that John suffered no loss of pay or benefits as a result of her removal from the Coordinator position,

which distinguishes this case from *Ciambrello* and *O'Connor*. This does not automatically preclude her from asserting a constitutionally protected property interest, however. For instance, in *Ezekwo v. New York City Health & Hospitals Corp.*, 940 F.2d 775, 782-83 (2d Cir. 1991), the Second Circuit held that a physician's expectation of serving as chief resident "rose to the level of a property interest entitled to the protections afforded by the Due Process Clause." The *Ezekwo* court found that the hospital's established practice of awarding the chief residency to all third year residents on a rotating basis, the hospital's assurance that the plaintiff would become chief resident, and the plaintiff's reasonable reliance on this course of conduct "created a contractual right that rose to the level of a significant property interest that would be protected under state law." *Id.* Next, the *Ezekwo* court found that, because the chief residency "denotes the culmination of years of study" and "is necessary [sic] a position that an individual can occupy only once in his or her career," the interest at stake "was of significant professional value." *Id.*

The interest at issue in this case cannot be analogized to the *Ezekwo* plaintiff's interest in becoming chief resident. While John asserts that the Coordinator position is "more prestigious" than that of a teacher, there is no evidence that the position "is the culmination of years of study" or holds "significant professional value." Instead, such a notion is belied by the fact that none of the other teachers in the Department volunteered for the Coordinator position when Ortiz offered it to them during the August 2007 meeting. Similarly, there is no evidence that John was promised the Coordinator position or told that she could remain in the position indefinitely, or that the Defendants otherwise engaged in a course of conduct that would invoke her reasonable reliance on her

entitlement to the position so as to give rise to a contractual right. Therefore, given the lack of any pecuniary benefit to serving in the Coordinator position and the absence of any evidence that the Coordinator position holds significant professional value, the Court finds that John's interest does not rise to the level of a constitutionally protected property right.

Further, even assuming John holds a property interest in the Coordinator position, the Court concludes that there was no due process violation here. In determining what process is due, the Court must balance three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

First, the relevant interest is not particularly substantial, given that it is undisputed that John suffered no reduction in salary or benefits as a result of her removal from the Coordinator position. Instead, she suffered loss of the title of Coordinator and, arguably, the prestige associated with that title. She also suffered the loss of certain job responsibilities, most notably her role as liaison between the Physical Education Department and Central High School administrators. While John may have suffered some embarrassment or psychological distress as a result of her loss of the title of Coordinator and associated job responsibilities, the Court does not believe the interest to be weighty since she suffered no loss in pay or in any other tangible benefit.

Second, the risk of erroneous deprivation of John's interest in the circumstances presented by this case is low. John was appointed to the Coordinator position in January of 2006. The evidence indicates that other teachers complained about John's methods as Coordinator, and specifically about her attempts to improperly exert control over other teachers in the Department, since at least September 2006 when Ortiz began serving as Principal for Central High School. In August of 2007, Ortiz met with John and other teachers to discuss their concerns about John. John was allowed to continue as Coordinator after no other teacher expressed interest in the position. However, the complaints continued following the meeting. Ortiz thereafter had informal discussions with John to remediate her performance, but the issues did not resolve. As a result, on April 2, 2008, Ortiz met with John and told her that she would no longer serve as Coordinator. Thus, the record reflects that John was allowed to remain serving as Coordinator and attempt to improve her performance for more than a year-and-a-half. John was aware of the complaints made by other teachers. Ortiz attempted to address them with her and tried to improve her managerial skills, to no avail, which ultimately led him to remove her from the position as a result of her failure to ameliorate the disharmony and friction within the Department. There is no indication that John was removed from the position erroneously; instead, it is evident that John was given ample opportunity to modify her approach in dealing with other teachers, but refused to do so.

Third, the Defendants have a strong interest in ensuring the smooth operation of the Physical Education Department. The record indicates that the role of Coordinator was created for the purpose of administrative convenience. The

Coordinator's main function is to serve as a liaison between the Department and Central High School administrators, thereby enabling administrators to communicate with members of the Department through the Coordinator rather than having to communicate with each teacher individually. The friction and disharmony caused by John's methods threatened to undermine that purpose and thereby create additional administrative burden.

Accordingly, based upon the *Eldridge* test, the Court holds that a pre-deprivation hearing or other pre-deprivation process was not necessary. John's access to post-deprivation remedies under State law, such as her ability to file a CHRO complaint or bring a CFEPA claim, was constitutionally sufficient in the circumstances of this case given the weakness of the purported property interest involved, assuming that such a property right exists at all. *See, e.g., Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (state tort remedy adequate protection for alleged intentional destruction of prisoner's property); *Costello v. Town of Fairfield*, 811 F.2d 782, 784 (2d Cir. 1987) (grievance procedure was sufficient remedy for retired police officers' claims of denial of increase in pension benefits); *Ramsey v. Board of Educ. of Whitney County, Kentucky*, 844 F.2d 1268, 1273 (6th Cir. 1973) (state contract action adequate remedy for denial of accumulated sick days).

With respect to John's due process claim based on the Defendants' failure to promote her, it is undisputed that the positions to which she applied were filled using a competitive process and that she had no automatic entitlement to a promotion to those positions. Therefore, John had no protected property interest in any promotional opportunity, and her due process claim fails as a matter of law. *See McMenemy v. City of Rochester*, 241 F.3d 279, 286-87 (2d Cir. 2001).

### E. Right to Contract

Finally, John alleges that the Defendants violated 42 U.S.C. § 1981 by interfering with her right to contract.  Section 1981 prohibits discrimination in, *inter alia*, the making and enforcing of contracts, and extends to private as well as state actors.  42 U.S.C. § 1981; *see also Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("It is established that Section 1981 prohibits discrimination based on race in the making and enforcement of contracts, and extends to private as well as state actors in that regard.") (citations omitted).  The statute defines the phrase "make and enforce contracts" to include the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.*

"To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements:  (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)."  *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).  The Second Circuit has interpreted Section 1981, in light of its language and legislative history, to apply to racial and ethnic discrimination as well as discrimination based upon alienage. *See Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998).  However, discrimination based upon other reasons, such as gender, religion, national origin or age, is not prohibited by Section 1981.  *See id.*

John has failed to demonstrate a genuine issue of material fact regarding her right to contract claim.  There is no evidence that the Defendants' treatment of John

was motivated by her race.  Furthermore, it is entirely unclear what "contract" John is claiming the Defendants interfered with.  Her complaint alleges that the Defendants interfered with her right to contract "under the Collective Bargaining agreement in force between the defendant agency and the Plaintiff through her union."  Compl. ¶ 55.  However, John has not alleged nor produced any evidence that the collective bargaining agreement she refers to contractually guaranteed her the right to be considered for, be appointed to, or perform duties respecting any of the positions implicated in this case.  Therefore, the Defendants are entitled to summary judgment with respect to John's 42 U.S.C. § 1981 claim.

### IV. CONCLUSION

Based on the above reasoning, the Defendants' Motion for Summary Judgment [Doc. #21] is GRANTED in its entirety.  The Clerk is directed to enter judgment for the Defendants, and to close this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  March 22, 2011.